## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| DAWN BERTA, | ) | CASE NO. 1:18CV00693 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Dawn Berta, ("Plaintiff" or "Berta"), challenges the final decision of Defendant,

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying her

application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act,

42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons

set forth below, the Magistrate Judge recommends the Commissioner's final decision be

AFFIRMED.[2]

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

[2]  On December 26, 2018, this matter was stayed due to the lapse of congressional appropriations funding the federal government.  *See* General Order 2018-15.  The stay was thereafter extended pursuant to General Order 2019-1.  As the government shutdown has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

# I.  PROCEDURAL HISTORY

In December 2012, Berta filed an application for DIB, alleging a disability onset date of November 15, 2006 and claiming she was disabled due to epilepsy, grand mal and partial seizures, back injury, panic disorder and spina bifida.  (Transcript ("Tr.") 15, 257, 316.)  The applications were denied initially and upon reconsideration, and Berta requested a hearing before an administrative law judge ("ALJ").  (Tr. 104-111, 113-124, 155-157, 161-168.)  On March 20, 2015, an ALJ held a hearing, during which Berta, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 66-102, 128.)  On July 30, 2015, the ALJ issued a written decision finding Berta was not disabled.  (Tr. 128-142.)

On August 19, 2016, the Appeals Council vacated the ALJ's decision and remanded for resolution of the following issue:

> The Administrative Law Judge found that, finding 3, through the date last insured, the claimant had severe diplopia and right homonymous hemianopsia.  Diplopia is an impairment of visual acuity, while homonymous hemianopsia is an impairment of the visual field.  While the decision's assessment of the claimant's residual functional capacity accounted for her right homonymous hemianopsia through a limitation to inability to use peripheral vision, the residual functional capacity includes no visual acuity-related limitations to account for the finding of severe diplopia. Further consideration is warranted with regard to the effects of the claimant's diplopia.

(Tr. 145.)

On February 22, 2017, the ALJ conducted a second hearing, during which Berta, represented by counsel, and an impartial VE testified.  (Tr. 15, 36-65.)  On April 6, 2017, the ALJ issued a written decision finding Berta was not disabled.  (Tr. 15-35.)  The ALJ's decision became final on January 26, 2018, when the Appeals Council declined further review.  (Tr. 1-6.)

On March 27, 2018, Berta filed her Complaint to challenge the Commissioner's final

2

decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 13, 14.)

Berta asserts the following assignment of error:

(1)     The administrative law judge's finding concerning residual functional capacity is not supported by substantial evidence; he erred in his evaluation of Ms. Berta's visual limitations prior to her date last insured.

(Doc. No. 11 at 10.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Berta was born in July 1976 and was thirty-five (35) years-old at the time of her date last insured, making her a "younger" person under social security regulations.  (Tr. 28.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has at least a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a loan clerk, outsides sales office equipment salesperson, advertising sales person, clerical worker, and financial sales representative.  (*Id.*)

### B.     Relevant Medical Evidence[3]

The record reflects Berta underwent brain surgery in July 1991, when she fourteen years old.  (Tr. 624-625.)  She subsequently developed seizures, which were characterized by "tunnel hearing," nausea, and speech loss.  (Tr. 454, 459.)  Berta was also noted to have developed a right homonymous hemianopsia, which is an impairment of the visual field.[4]  (Tr. 627.)  Berta

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Moreover, as Berta's assignment of error relates solely to her visual impairments, the Court will generally confine its recitation of the medical evidence to evidence relating to those conditions.

[4] Homonymous hemianopsia "is a condition in which a person sees only one side - right or left- of the visual world of each eye, [which] results from a problem in brain function

was treated with medication, and was able to complete high school, obtain her driver's license, and maintain employment.  (Tr. 23, 70, 76-77, 303, 454.)

In October 2004, Berta suffered a seizure that included hallucinations, shaking, and stiffening.  (Tr. 454-455, 460.)  An MRI of her brain showed an area of extensive encephalomalacia in the left posterior temporal, parietal, and occipital regions.  (Tr. 460.)  The following month, Berta underwent 24 hour video/EEG monitoring, which was abnormal and documented seizure activity.  (Tr. 459-461.)  Berta was prescribed Lamictal and advised not to drive.  (Tr. 461.)

In August 2005, Berta presented to neurologist Dhruv R. Patel, M.D.  (Tr. 575.)  She reported she had been "doing quite well" but had recently experienced several "spells."  (*Id*.)  She denied any forgetfulness and stated "she has not had any side effects of medication."  (*Id*.)  Examination findings were normal and there is no mention of visual dysfunction, such as blurred or double vision.  (*Id*.)  Dr. Patel assessed complex partial seizures with underlying left parietal occipital astrocytoma, and prescribed Tegretol and Buspar.  (*Id*.)

Berta returned to Dr. Patel on February 3, 2006. (Tr. 574.)  She indicated she had been "doing quite well" and "has not had any spells."  (*Id*.)  She denied any medication side effects, and there is no mention of any complaints of blurred or double vision.  (*Id*.)  Physical examination findings were normal.  (*Id*.)  Dr. Patel increased Berta's Buspar dosage, and released her to drive.  (*Id*.)

On August 15, 2007, Berta underwent video EEG monitoring, which was abnormal and

---

rather than a disorder of the eyes themselves."  *See* https://www.my.clevelandclinic.org/health/diseases/15766-homonymous-hemianopsia.

4

revealed seizure activity.  (Tr. 463-467.)  Treatment notes indicate "right hemifield deficit (since surgery age 15- passed drivers test thereafter) [and] bilateral horizontal nystagmus" but no other abnormalities, such as blurred or double vision.  (Tr. 464.)  Berta's physicians assessed left posterior quadrant refractory epilepsy and found she was a candidate for invasive EEG evaluation.  (Tr. 465.)

On November 16, 2007, Berta reported daily seizures, fatigue, shaking, and side effects from her medication.  (Tr. 468.)  Examination revealed "a right visual file deficit" in Berta's visual field as well as "gaze evoked nystagmus."  (Tr. 470.)  Dr. Patel assessed intractable left temporal lobe epilepsy with likely Tegretol toxicity and advised Berta not to drive.  (*Id.*)

The following month, Berta indicated she was "doing good."  (Tr. 557.)  She stated "she still has 3-4 seizures a week which are very short and this does not bother her."  (*Id.*)  She denied any new symptoms and there is no mention of complaints of blurred or double vision.  (*Id.*)  Examination revealed normal visual acuity and visual fields.  (Tr. 558.)  Dr. Patel discontinued her Buspar.  (Tr. 559.)

Berta returned to Dr. Patel on April 15, 2008.  (Tr. 554.)  She reported that she continued to experience 2 to 3 seizures per week but stated "these are very brief and partial" and they "don't bother her."  (*Id.*)  She did not report blurred or double vision, and examination revealed normal visual acuity and visual fields.  (Tr. 554-555.)

On October 20, 2008, Berta stated "she still has a few spells, which are very subtle and occur several times a day."  (Tr. 551.)  Dr. Patel noted the results of a recent MRI of her brian, which showed no changes since her October 2004 MRI.  (*Id.*)  Once again, Berta did not report blurred or double vision, and examination revealed normal visual acuity and visual fields.  (Tr.

552.)  Dr. Patel diagnosed generalized convulsive epilepsy without mention of intractable epilepsy, and partial epilepsy without mention of impairment of consciousness.  (*Id*.)

Berta returned to Dr. Patel six months later, on April 20, 2009.  (Tr. 548.)  He noted she "has very mild, fine, partial seizures," during which she does not lose consciousness or awareness.  (*Id*.)  He also noted that she continued to drive and "complains of being tired only occasionally."  (*Id*.)  Berta did not report blurred or double vision, and examination revealed normal visual acuity and visual fields.  (Tr. 549.)

On December 23, 2009, Berta reported experiencing only "minor tiny petit mal seizures." ( Tr. 545.)  She denied medication side effects, and did not complain of any visual dysfunction . (*Id.*)  Examination findings were normal, including normal visual acuity and visual fields.  (*Id*.) Dr. Patel found Berta's "generalized seizures are well controlled" and her "complex partial seizures with secondary generalization" had "done well with Tegretol."  (Tr. 546.)  He continued her on her medications.  (*Id*.)

On June 23, 2010, Dr. Patel noted as follows: "The patient is actually very well controlled on Tegretol.  The patient has very minimal occasional brief events which could be brief seizures. These are very infrequent and does not require any treatments." (Tr. 542.)  Berta denied any visual dysfunction and stated she "functions well in her activity of daily living."  (*Id*.) Examination findings were again normal, including normal visual acuity and visual fields.  (Tr. 543.)

Berta returned to Dr. Patel on December 13, 2010.  (Tr. 539.)  She stated she "has been doing good," with "some occasional partial seizures" that are "very brief."  (*Id*.)  Berta denied medication side effects and "is not complaining of any double vision [or] blurry vision."  (*Id.*)

6

She also reported she was "able to drive without any difficulty." (*Id.*) Examination findings were normal, including normal visual acuity and visual fields. (Tr. 540.)

On March 18, 2011, Berta underwent an EEG, which found as follows: "This is an abnormal electroencephalogram due to asymmetrial slowing coming from the left hemisphere. No active epileptic discharges were seen during the record. The patient is going for a vagal nerve stimulator because of uncontrolled seizures. If clinically indicated we may repeat the study again after sleep deprivation." (Tr. 450.)

On March 22, 2011, Berta presented to neurologist Nancy Foldvary Schaefer, D.O., at the Cleveland Clinic Neurological Institute Epilepsy Center. (Tr. 473-483.) She reported daily seizures with diminished hearing, inability to speak, and confusion. (Tr. 478.) Berta reported no blurred or double vision, and indicated she continued to drive on a limited basis. (*Id.*) Examination was normal, aside from right homonymous hemianopsia. (*Id.*) Dr. Schaefer prescribed a trial of Vimpat, and advised Berta not to drive. (Tr. 479-480.)

Berta returned to Dr. Patel on June 22, 2011. (Tr. 535-538.) She reported worsening seizures and stated "she did not do well on Vimpat." (Tr. 535.) Dr. Patel noted "the patient was discontinued from Vimpat, as she had called us as she was showing significant side effects." (*Id.*) The precise nature of Berta's side effects are not recorded in Dr. Patel's treatment note. (*Id.*) Examination findings were normal, including normal visual acuity and visual fields. (Tr. 537.)

Four months later, on October 21, 2011, Berta presented to Dr. Patel for follow up. (Tr. 531-533.) Dr. Patel noted as follows:

> The patient is a 35-year-old right-handed female with a history of generalized seizure disorder secondary to a previous tumor radiation with radiation necrosis. The patient has complex partial seizures. She still has some seizures on a daily basis which are very brief and does not effect her activity of daily living

and well being. We have not recommended any on-going treatments for the same. She has had no notable nonepileptic phenomena. . . She is supposed to be on Tegretol XR 4-00 mg three tablets daily and Vimpat 50 mg bid.

Since last seen she still reports that she has responded to Vimpat. Her seizure frequency which is very transient lasting for 1-2 seconds, appears to be much lower. **She does complain of a tremor in the right hand which she feels is secondary to the Vimpat. <u>She has not had any other side effects</u>**.

She is here to discuss further options and she would like to be completely free of these episodes.

(Tr. 531) (emphasis added). Examination findings were again normal, including normal visual acuity and visual fields. (Tr. 533.) Dr. Patel did, however, note "a very fine tremor . . . on [Berta's] outstretched hand on the right." (*Id.*) Dr. Patel concluded as follows:

Complex partial seizures with maximum control Tegretol with the addition of Vimpat. **The patient is doing very well with the medication. She does have some minor side effects which are expected with any anticonvulsants**. She is here to discuss becoming completely seizure free. This is unlikely to occur; as the patient has surgical scars from a tumor removal and possibly radiation necrosis as well. She may seek another opinion if she likes. We will continue to discuss this with her; as she has had opinions in the past.

I recommended, though, that we must maximize her Vimpat to at least 200 mg before we may consider any other options. She is likely to have some side effects which she needs to accept. Occasional 1-2 second episodes have been reported with her. I will continue to follow her.

(Tr. 533) (emphasis added).

The remainder of the medical evidence is dated after Berta's date last insured of December 31, 2011. On January 3, 2012, Berta returned to Dr. Patel with reports of worsening seizures. (Tr. 527-530.) Dr. Patel nonetheless noted Berta was "doing very well on Vimpat." (Tr. 527.) He stated "she did have some tremors with this medication, though, she has otherwise done very well." (*Id.*) Dr. Patel expressly noted that Berta "is not complaining of double vision [or] blurred vision." (*Id.*) Examination findings were normal, including normal visual acuity and

8

visual fields.  (Tr. 529.)  Dr. Patel increased her Vimpat dosage, ordered an MRI and EEG, and advised her "that she must not drive for the next few weeks."  (*Id*.)

Berta returned to Dr. Patel several weeks later, on January 31, 2012.  (Tr. 523-526.)  Dr. Patel noted that the MRI of Berta's brain "does not show any suggestion of recurrent tumor activity."  (Tr. 523.)  He also stated that Berta "did call us saying that she was having some dizzy spells secondary to possibly Vimpat" and, therefore, he decreased her medication.  (*Id*.)  There is no indication that Berta complained of blurred or double vision.  (*Id*.)  Dr. Patel noted "minimal tremor" in Berta's bilateral hands but examination findings were otherwise normal, including normal visual acuity and visual fields.  (Tr. 525.)  Berta indicated she was "functioning quite well." (Tr. 523.)

On July 10, 2012, Berta returned to Dr. Patel for follow up.  (Tr. 520-522.)  He noted as follows:

> This is a 35-year-old right-handed female with a history of generalized seizure disorder secondary to previous low grade astrocytoma. with the possibility of radiation necrosis.  The patient is on a combination of Tegretol and Vimpat. The patient is doing quite well.  She does have some minor seizures on and off which are very subtle. She does not quite lose awareness with this; she is aware of what is going on around her. The  patient, though, continues to complain of symptoms. We had further obtained an electroencephalogram but we have seen no seizures.  **The patient's only side effect of Vimpat appears to be double vision.  She did have double vision after her surgery, although this is worse at times.  She though likes the medication, as she responds to it.**  She has not had any other side effects.
>
> She has not had any  headaches, nausea, vomiting, chest pain, palpitations, or shortness of breath.  **She does not complain of . . . double vision, blurry vision**, or burning pain.  She denies any bleeding, bruising, choking. or drooling.  She has not had any  falls, injuries, or trauma.  She has not had any  generalization of  her seizures.

(Tr. 520) (emphasis added).  Later, Dr. Patel indicated Berta "does not complain of any other

symptoms, except for double vision, which she has from Vimpat, which has been described as a side effect."  (Tr. 522.)  Nonetheless, on physical examination, Dr. Patel noted normal visual acuity.  (*Id*.)  He found she was "quite stable" on her medications.  (*Id*.)

On August 17, 2012, Berta presented to ophthalmologist Lisa Lystad, M.D., with complaints of double vision and blurred vision.  (Tr. 484-488.)  She reported a "long history of diplopia (vertical) since . . . brain surgery for astrocytoma at age 14."  (Tr. 484.)  Berta further indicated that she currently suffered from horizontal binocular diplopia "in distance and near x 1 year both distance and near."  (*Id*.)  She underwent a vision test on that date, which revealed visual acuity with correction of 20/30 on the right and 20/25 on the left.  (Tr. 486, 513-514.)  Dr. Lystad assessed (1) "exotropia,[5] decompensating with slight vertical component;" (2) right homonymous hemianopsia status post tumor resection; (3) mild optic atrophy, bilateral; and (4) dipoplia. (Tr. 487-488.)  She prescribed glasses and referred Berta for surgical evaluation.  (Tr. 487.)

On September 13, 2012, Berta presented to opthalmologist Paul Rychwalski, M.D., for surgical evaluation.  (Tr. 489-493.)  She stated she had experienced diplopia for 21 years and that it had become increasingly worse over the past year.  (Tr. 489.)  Dr. Rychwalski recommended eye surgery (i.e., right lateral rectus recession +/- right medial rectus recession for right exotropia), which Berta underwent on November 16, 2012.  (Tr. 492, 504, 506-507.)  On November 27, 2012, Berta reported her diplopia was "worse since surgery."  (Tr. 508.)

Berta returned to Dr. Patel on December 7, 2012.  (Tr. 516-519.)  She reported suffering

---

[5] Exotropia is "a form of strabismus (eye misalignment) in which one or both of the eyes turn outward."  *See* https://www.aapos.org.

three grand mal seizures after her eye surgery, but was "doing fine now."  (Tr. 516.)  Berta

complained of double vision, noting "[s]he had double vision even prior to starting the Vimpat,

though, the Vimpat has been shown to have some addition."[6]  (*Id*.)  On examination, Dr. Patel

noted that Berta "constantly continues to keep closing her right eye as if to have double vision."

(Tr. 518.)  He also notes, however, that her visual acuity and visual fields are normal.  (*Id*.)  Dr.

Patel continued her on her medications and advised her not to drive, noting "given that she now

has double vision and eye issues, she should not drive." (Tr. 519.)

On April 9, 2013, Berta complained of daily seizures and "occasional double vision."

(Tr. 560.)  Examination findings were normal, including normal visual acuity and visual fields.

(Tr. 562.)

Berta did not return to Dr. Patel until over a year and a half later, on November 11, 2014.

(Tr. 566-569.)  She reported "minor seizures three times a week," which she described as "very

brief and very subtle." (Tr. 566.)  Berta indicated her seizures did not affect her activities of daily

life, although she did complain of worsening memory issues.  (*Id.*)  She denied double vision and

blurry vision.  (*Id*.)  Dr. Patel found that Berta "is permanently disabled from the work she can

do."  (Tr. 569.)

On that same date, Dr. Patel completed a Medical Source Statement regarding Berta's

physical abilities and limitations.  (Tr. 564-565.)  He concluded her seizures significantly

interfered with her activity during the day, and affected her memory and cognitive ability.  (*Id*.)

Dr. Patel also found Berta should be precluded from working around moving machinery,

---

[6] Later in Dr. Patel's treatment note, however, he states that Berta denies any visual
dysfunction, including any double vision or blurry vision.  (Tr. 516.)

11

dangerous equipment, and heights; and would likely be absent or need to leave work early for medical reasons four or more times per month.  (*Id*.)

**C.      State Agency Reports**

On March 13, 2013, state agency physician Gerald Klyop, M.D., reviewed Berta's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment for the period November 15, 2006 through December 31, 2011.  (Tr. 108-110.)  Dr. Klyop found Berta had no exertional or manipulative limitations.  (*Id*.)  He concluded she had an unlimited capacity to balance, stoop, kneel, crouch, crawl and climb ramps/stairs; but should never climb ladders, ropes or scaffolds due to her seizures.  (*Id*.)  With regard to Berta's visual limitations, Dr. Klyop opined she had an unlimited capacity for near acuity, far acuity, depth perception, accommodation and color vision, but had a limited field of vision on her right due to her right homonymous hemianopsia.  (*Id*.)  Finally, he found Berta should avoid even moderate exposure to heights, driving, and dangerous machinery.  (*Id*.)

On August 5, 2013, state agency physician William Bolz, M.D., reviewed Berta's medical records and completed a Physical RFC Assessment for the period November 15, 2006 through December 31, 2011.  (Tr. 121-122.)  He reached the same conclusions as Dr. Klyop.  (*Id*.)

**D.      Hearing Testimony**

As noted above, Berta testified at two administrative hearings, the first in March 2015 and the second in February 2017.  During the March 20, 2015 hearing, Berta testified to the following:

- She lives with her husband and 7 year old son.  (Tr. 70.)  She had brain surgery in 1991, which has resulted in seizures, vision problems, and memory loss.  (Tr. 86-87.)  She has previous work experience selling office furniture and processing loan paperwork. (Tr. 74-77.)  She stopped working in 2006 because

12

her seizures were increasing, which interfered with her work performance.  (Tr. 77, 79.)  Her inability to drive also impeded her ability to work.  (*Id*.)

- She has seizures three times per day.  (Tr. 77.)  During her seizures, she feels nauseous, loses her speech, and experiences "tunnel hearing."  (*Id*.)  The seizures themselves last only a few minutes, but it takes some time for her to regain her speech and she feels exhausted afterwards for the rest of the day.  (Tr. 77-78, 87-88.)  Her seizures have increased over the past few years.  (Tr. 81.)  She used to have three per week; now she has three per day.  (Tr. 81-82.)  She takes Tegretol for her seizures but it causes tremors in her hands and memory loss.  (Tr. 82-83.)

- She also experiences vision problems as a result of her brain surgery.  (Tr. 79-81.)  She has no peripheral vision in either eye.  (*Id*.)  She also has double vision at certain angles, which worsens when she is tired.  (*Id*.)  She had surgery to fix her double vision but it was unsuccessful.  (*Id*.)  Her vision problems have worsened over the years.  (*Id*.)

- She has difficulty with short-term memory as a result of her surgery.  (Tr. 86-87.)  Her memory problems have gotten "extremely worse" over the past few years.  (*Id*.) She does not remember what she reads.  (Tr. 72.)

- She also suffers from back pain and abdominal pain.  (Tr. 82.)  She can lift 10 to 15 pounds; can stand and walk for 10 minutes each before needing to sit down; and can sit for 30 minutes before needing to change positions.  (Tr. 84-85.)  She has trouble reaching for things in front of her due to her vision problems.  (Tr. 85.)  She has difficulty climbing stairs due to fatigue.  (*Id*.)

- She is able to prepare meals, wash dishes, vacuum, sweep, and do the laundry.  (Tr. 70-71.)  She has no difficulty with self-care, including bathing, dressing, etc.  (*Id*.)  She goes to church on Sundays and is involved in church groups.  (*Id*.)  She goes to the grocery store with her husband, but will not go alone because she is afraid of having a seizure in the store.  (Tr. 71, 87.)  She cares for her 7 year old son with help from her husband and mother.  (Tr. 90-91.)  She watches television, but does not read much due to her vision and memory problems.  (Tr. 71-72.)  She takes two 45 minute naps per day, and goes to bed at 7:00 p.m. each night.  (Tr. 73, 87.)

During the February 22, 2017 hearing, Berta testified to the following:

- In 1995, she worked in the service department at a car dealership.  (Tr. 52.)  This was primarily a clerical job.  (*Id*.)  From 2001 to 2002, she worked as a finance manager during which she processed car loans.  (Tr. 50.)  In this position, she sat all day and did not lift more than 10 pounds.  (*Id*.)  In 2005, she worked as an auto trader; i.e., she sold advertising spots in a catalog.  (Tr. 49-50.)  She did a

13

great deal of driving in this job, and called on approximately ten customers per day.  (*Id.*)  From 2002 to 2006, she worked as an outside sales representative.  (Tr. 48-49.)  In this position, she drove to businesses to sell office furniture.  (*Id.*)  She drove "all day, every day" and lifted no more than 20 pounds.  (*Id.*)

- Since her brain surgery in 1991, she has experienced vision problems, including a lack of peripheral vision and double vision.  She described her vision at the video hearing as follows: "[L]ooking at this screen right now, I see half of it.  If I turn my head all the way around, I still see half.  Trying to do things as far as wiping down my kitchen table, my husband points out to me that I miss the whole side of it because I don't see it.  Reading is a mess because I have double vision on top of not being– having the peripheral vision, and I also don't have short-term memory.  I lost that in my brain surgery.  So not only can I not see it, I don't remember what I read. It's frustrating."  (Tr. 43.)

- She experiences double vision at certain angles, particularly when things are directly in front of her.  (Tr. 44.)  She used to see images on top of each other but "now they're side by side, so I don't know which is which, what's the real image, and what's the double."  (*Id.*)  Her double vision has gotten a lot worse over the last six to ten years.  (Tr. 45.)

- Because of her vision problems, it takes her a lot longer to do things.  (Tr. 44.)  She forgets about things she needs to do when she does not see them.  (Tr. 44-45.)  In addition, writing and filling out forms takes her much longer.  (*Id.*)  When she has to go to the doctor's office, she has the forms mailed to her ahead of time so she has enough time to fill them out.  (*Id.*)  She experiences anxiety in public places because she is afraid she is going to run into people.  (Tr. 45.)  She has, in fact, run into doorways and knocked things over due to her vision deficits.  (Tr. 45-46.)

- She has suffered from seizures since her brain surgery.  (Tr. 46.)  She experiences two to three petit mal seizures per day, lasting two minutes each.  (*Id.*)  During her seizures, she loses her speech and feels nauseous.  Afterwards, it takes approximately 20 to 30 minutes for her to recover.  (*Id.*)  She generally feels exhausted for the rest of the day.  (Tr. 47.)  She has experienced more frequent seizures during the last ten years.  (*Id.*)

- In 2012, her doctor told her she should no longer drive.  (Tr. 46.)  Since then, she only drives "emergency short distances."  (*Id.*)

The VE testified Berta had past work as a (1) loan clerk (sedentary, SVP 4); (2) outside

sales professional, office equipment (medium performed at light, SVP 5); (3) sales

representative, advertising (light, SVP 6); (4) clerical worker (light, SVP 4); and (5) sales

representative, financial (light, SVP 7).  (Tr. 54.)  The ALJ then posed the following hypothetical

question:

> The first hypothetical, assume that a hypothetical individual of the claimant's age,
> education, and work experience has the residual functional capacity for work at the
> medium exertional level, postural limitations of no climbing of ladders, ropes, or
> scaffolds. Environmental limitation to avoid all exposure to hazards such as
> dangerous moving machinery, commercial driving, handling of sharp objects, and
> unprotected heights. The hypothetical individual must not be responsible for the
> safety of others. Visual limitation to jobs not requiring peripheral vision, and not
> requiring more than occasional near and far acuity.

(Tr. 55.)

The VE testified the hypothetical individual would not be able to perform Berta's past

work, but would be able to perform other representative jobs in the economy, such as hand packer

(medium, unskilled, SVP 2), laundry worker (medium, unskilled, SVP 2), and janitor (medium,

unskilled, SVP 2).  (Tr. 55-56.)

The ALJ then asked a second hypothetical that was the same as the first but with a light

(instead of medium) exertional level.  (Tr. 56.) The VE testified the hypothetical individual would

be able to perform the job of housekeeper (light, unskilled, SVP 2).  (Tr. 56-57.)

The ALJ then asked whether there would be any work in the national economy for an

individual that is "allowed to consistently be off task more than 15 percent of the work period."

(Tr. 57.)  The VE testified there would be no work for such an individual.  (*Id*.)  The ALJ then

asked the VE to explain employer tolerance for absences on a monthly basis.  (*Id.*)  The VE stated

that "employers will generally allow one unexcused absence per month after the probationary

period, and that would include coming in late, or leaving early, but during the probationary

period, which varies, but it averages 90 days, many employers do not allow any absences."  (*Id*.)

Berta's attorney then asked the following questions regarding limitations relating to her visual acuity:

Q.      In the DOT one of the hypotheticals here, two of the hypotheticals, I guess, had the limitation of not more than occasional far acuity, and occasional near acuity, and as I review the Selected Characteristics of Occupations, and the DOT, I noticed in terms of acuity, those are basically the two that are addressed, and I see that they're defined as being -- near acuity being less than -- 20 inches or less, and far acuity being 20 feet or more.  Is that consistent with your understanding of what those terms mean?

A.      Yes.

Q.      So if we had an individual that also would have difficulty with acuity -- let me -- before I pose the hypothetical question, would you think it's fair to say that there's a presumption in the DOT and SCO that all of these occupations require some basic level of acuity, clarity for vision, in that distance between 20 inches and 20 feet?

A.      Some, yes, yes.

Q.      So if the individual could only, say, occasionally engage in the activities requiring medium level acuity, something between the 20 inches and the 20 feet, how would that affect your response?

A.      So I'm trying to say this in a way that we're all on the same page.  So we've already addressed the very far vision, and the near vision, so if an individual is -- basically has no range of vision in front of them beyond 20 inches more than a third of the day, so they -- just kind of visualize this.  They can't see 20 inches in front of them, or 20 feet beyond them, and only occasionally -- and only one-third of the day can they see in between, I think that would pose significant difficulty in an individual performing any work.

Q.      So let me express it in a different way because I think the issue is not quite that frequency isn't quite so much the issue here.  It's not that her eyes get tired after a third of the day and then she can't see.  I think the issue is more just not having good acuity, not being able to see well at all ranges, near, far, and everything in between. And I know that you're kind of limited to your own experience in answering this, at least as I view the DOT, it doesn't talk about anything other than near and far, along with some other kinds of specific characteristics of vision, which don't have to do with acuity per se.  So if the issue is just lack of clarity at all ranges, is that a vocationally-relevant way of phrasing the limitation?

16

A.    Yes, and I do hear what you're saying.  The examples that I did provide in the medium category, the hand packer, the janitor, the laundry worker, and in the light category the housekeeper, these four examples don't require a lot of attention to fine detail, or anything of that -- in that regard obviously, but they do still require the ability for someone to be able to see that they have done the job tasks as they are instructed.  So if someone's overall vision is significantly impaired, I think that would be an impact on their ability to perform the jobs without -- I don't want to say having errors, but I think that it could lead to the individual's ability to do their job thoroughly if they're unable to see clearly.

Q.    So in your opinion - - so you believe that creates a problem with sustainabilty?

A.    I do, I do.  I mean, to go back to the way that you had initially phrased it, occasionally engage in, you know, the medium level of acuity, that's a pretty significant limitation, and I think that would significantly impact the person's ability to maintain their job.

(Tr. 58-60.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir.

17

1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f)  *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Berta was insured on her alleged disability onset date, November 15, 2006, and remained insured through December 31, 2011, her date last insured ("DLI.")  (Tr. 15.)  Therefore, in order to be entitled to POD and DIB, Berta must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

18

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2011.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 15, 2006 through her date last insured of December 31, 2011 (20 CFR 404.1571 et seq.)

3.  Through the date last insured, the claimant had the following severe impairments: epilepsy/seizures; diplopia with double vision; right homonymous hemianopia; and status post brain tumor resection (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except postural limitation of no climbing of ladders, ropes, or scaffolds. Environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery, commercial driving, handling of sharp objects, and unprotected heights. The claimant must not be responsible for the safety of others. Visual limitation to jobs not requiring peripheral vision, and not requiring more than occasional near and far acuity.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on July ** 1976, and was 35 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.  The claimant had at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from November 15, 2006, the alleged onset date, through December 31, 2011, the date last insured (20 CFR 404.1520(g)).

(Tr. 15-29.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec*., 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are

20

not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *RFC – Visual Acuity*

Berta argues the RFC is not supported by substantial evidence with respect to visual limitations resulting from her diplopia.  (Doc. No. 11 at 10-17.)  She maintains that "while the administrative law judge found limitations on visual acuity, the limitations he identified did not go far enough" because they only accounted for her near and far vision deficits.  (*Id*. at 11.)  Citing her hearing testimony, Berta maintains her "diplopia is an issue throughout her range of vision" and argues the ALJ fails to fully account for this in the RFC despite finding it a severe impairment at step two.  (*Id*.)  She further asserts the ALJ's "flawed [RFC] analysis" is the result of his failure to properly evaluate her subjective symptoms pursuant to Social Security Ruling 16-3p, 2016 WL 1119029 (SSA 2016).  Berta argues the ALJ "simply provides no rationale to explain why [her] visual acuity was only impaired in the near and far ranges" and maintains the ALJ misconstrued the medical evidence in concluding her vision worsened only after her November 2012 surgery.  (*Id*. at 14-16.)  Lastly, Berta argues the ALJ's error is not harmless because the VE testified there would be no work for a person that is unable to consistently see with clarity at all ranges.  (*Id*. at 16.)

The Commissioner argues the ALJ properly assessed Berta's visual limitations during the relevant period; i.e., between her alleged onset date of November 15, 2006 through her date last insured of December 31, 2011.  (Doc. No. 13 at 5-10.)  She maintains Berta's argument to the

22

contrary fails because "she did not put forth any objective medical evidence, such as a visual examination, showing that she had greater visual limitations than the ALJ found." (*Id*. at 6.)  The Commissioner asserts the ALJ was not bound by Berta's subjective statements and properly evaluated the medical evidence to determine that her "allegations are greater than expected in light of the objective clinical evidence and treatment notes."  (*Id*. at 7.)  The Commissioner argues the ALJ's finding is supported by substantial evidence in the record, noting "there is no indication from the treatment record showing that Plaintiff complained of double vision prior to her date last insured." (*Id*.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).[7]  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec*., 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an

---

[7] This regulation has been superseded for claims filed on or after March 27, 2017.  As Berta's application was filed in December 2012, this Court applies the rules and regulations in effect at that time.

23

obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ determined Berta suffered from the severe impairments of epilepsy/seizures, diplopia with double vision, right homonymous hemianopia, and status post brain tumor resection. (Tr. 17.) After finding Berta's impairments did not meet or equal the requirements of a Listing, the ALJ proceeded at step four to consider Berta's subjective symptoms as well as the medical and opinion evidence. (Tr. 20-30.) The ALJ first acknowledged Berta's testimony that she "she stopped driving due to seizures, has no peripheral vision, and when she turns her head one way, she has double vision that did not improve with surgery." (Tr. 21.) He also recounted her testimony that her visual impairments, including her double vision, made it difficult for her to read; "makes it take longer to do chores and fill out papers;" and causes her to run into people, doorways, and knock things over. (Tr. 22.)

The ALJ then determined that Berta's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, her statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent" with the medical evidence and other evidence in the record. (*Id.*) The ALJ identified several reasons

24

for this conclusion. First, the ALJ found that "for the period from November 15, 2006 through December 31, 2011, the claimant's subjective complaints of disabling symptoms and limitations is diminished because those allegations are greater than expected in light of the objective clinical evidence and treatment notes." (*Id*.) The ALJ then recounted the medical evidence at length. The decision recognized that Berta underwent brain surgery in 1991 and thereafter suffered from seizures, blurry vision, and loss of visual field. (Tr. 23.) However, the ALJ noted physical examination findings of normal visual acuity throughout the relevant time period, as well as the fact that Berta denied blurred vision and indicated she was able to drive without difficulty in December 2010. (Tr. 23-24.) The ALJ further noted as follows:

> The October 21, 2011 visit was within two months the claimant's date last insured of December 2011. This October 2011 visit noted her visual acuity and visual fields were within normal limits. There was no significant treatment of complaints of visual difficulties prior to the claimant's date last insured. The claimant [] complained of a long history of diplopia in August 2012 but there was no objective evidence or significant treatment to support additional visual limitations than outlined in the residual functional capacity. The August 17, 2012 assessment was diplopia, homonymous bilateral field defects in visual field, optic atrophy of both eyes, exotropia, and astrocytoma brain tumor (Exhibit 2F 32-36). In November 2012, her visual distance acuity was 20/30 right and 20/25 left (Exhibit 2F 34).

(Tr. 24.)

Second, the ALJ determined "the claimant has described daily activities, which are not limited to the extent one would expect, given her complaints of disabling symptoms and limitations." (Tr. 25.) The ALJ noted that Berta "reported that she was able to care for her personal needs, as well as those of her young son on a daily basis. She also reported that she was able to prepare meals, care for her pets, do housekeeping chores (cleaning, laundry, etc), shop (by phone and in stores), count change, handle a checkbook, watch television, bake sweets, go to church, and visit with family/friends." (*Id*.) The decision further observed that Berta "was able

25

to work with vision problems."  (Tr. 26.)

The ALJ then considered the opinion evidence, according "little weight" to Dr. Patel's November 2014 opinion on the grounds it was inconsistent with the medical record and his own findings.  (Tr. 26.)  The ALJ also accorded "little weight" to the opinions of Drs. Klyop and Bolz, finding a medium exertional limitation was more appropriate in light of Berta's subjective complaints.  (Tr. 26-27.)

The ALJ assessed the following RFC: "[T]he claimant had the residual functional capacity to perform medium work as defined in 20 CFR  404.1567(c) except postural limitation of no climbing of ladders, ropes, or scaffolds.  Environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery, commercial driving, handling of sharp objects, and unprotected heights.  The claimant must not be responsible for the safety of others.  Visual limitation to jobs not requiring peripheral vision, and not requiring more than occasional near and far acuity."  (Tr. 21.)  The ALJ concluded by explaining as follows:

> In sum, the above residual functional capacity assessment is supported the longitudinal  medical record for the period at issue.  A portion of the opinion from the State agency medical consultants regarding the hazard and climbing limitations supports the residual functional capacity.  The claimant's significant activities and the record as a whole support the residual functional capacity.   As a result of the claimant's impairments, the claimant can perform the above residual functional capacity.   For safety concerns, the claimant's seizures and visual deficits support reducing her to lifting and carrying up to a medium exertional level.  Her epilepsy and seizures support no exposure to climbing of ladders, ropes, or scaffolds and she should avoid all exposure to hazards, such as dangerous moving machinery, commercial driving, handling of sharp objects, and unprotected heights.  Her seizure and visual limitations support she should not be responsible for the safety of others.  Her diplopia with double vision and right homonymous hemianopia support she should not perform any jobs requiring peripheral vision, and not requiring more than occasional near and far acuity.

(Tr. 27.)

Berta first argues the ALJ erred because he failed to include limitations relating to the impairment of her full range of vision; i.e., her vision between the ranges of "near acuity" (20 inches or less) and "far acuity" (20 feet or more).  This argument is without merit.  The ALJ thoroughly discussed the medical evidence regarding Berta's visual impairments and explained that the objective medical evidence did not support further limitations for the time period between her November 2006 alleged onset date and her December 2011 DLI.  This finding is supported by substantial evidence.  As set forth *supra*, the record reflects that, throughout the relevant time period, physical examination findings consistently indicated normal visual acuity.  (Tr. 558, 555, 552, 549, 546, 543, 539-540, 478, 537, 533.)  Moreover, Berta has not directed this Court's attention to any medical evidence indicating she reported or complained of blurred or double vision at any point between November 2006 and December 2011.  The Court's own review did not reveal any documentation of blurred or double vision in treatment notes from this time period. (Tr. 575, 574, 558, 555, 552, 549, 545-546, 542-543, 539-540, 478, 535-537, 533.)  To the contrary, Berta expressly denied double vision, blurred vision, or visual dysfunction on several occasions during the relevant time period.[8]  (Tr. 539, 542, 478.)  In the absence of any medical evidence to the contrary, Berta has failed to show that the visual acuity limitations in the RFC are not supported by substantial evidence.

Berta, however, asks this Court to interpret treatment records post-dating her DLI as demonstrating that she did, in fact, suffer from diplopia during the relevant time period.

_____

[8] Berta argues in her Reply Brief that examination findings of normal visual acuity are not dispositive because "diplopia results in a limitation that does not precisely correspond to visual acuity." (Doc. No. 14. at 3.)  Even assuming, *arguendo*, this is the case, the fact remains Berta did not complain of double or blurred vision during the relevant time period and, in fact, expressly denied it on several occasions, as set forth above.

27

Specifically, Berta asserts that a treatment note from July 2012 indicates she experienced increased double vision as a result of Vimpat, which was first prescribed in March 2011. (Tr. 520.) She notes that, on July 10, 2012, Dr. Patel indicated "the patient's only side effect of Vimpat appears to double vision" and, further, stated "she did have double vision after her surgery, although this is worse at times." (Tr. 520.) Based on this treatment note, as well as the fact that she underwent corrective eye surgery in November 2012, Berta asserts the ALJ erred in concluding her double vision did not warrant greater visual acuity restrictions in the RFC.

The Court finds this argument to be without merit for the following reasons. In October 2011 (the last treatment note before her DLI), Berta expressly stated that the only side effect she suffered from Vimpat was hand tremors. (Tr. 531.) Her visual acuity was normal on that date. (Tr. 533.) Several months later, in January 2012, Dr. Patel expressly noted that Berta "is not complaining of double vision [or] blurred vision." (Tr. 527.) Again, Berta's visual acuity was normal. (Tr. 529.) The first mention of any complaints of double or blurred vision is on July 10, 2012, nearly seven months after Berta's DLI. (Tr. 520.) Nonetheless, Berta was noted as having normal visual acuity on that date, and a vision test in August 2012 showed 20/30 vision on the right and 20/25 on the left with correction. (Tr. 522, 486.) In light of the above, the Court finds substantial evidence supports the ALJ's conclusion that additional visual acuity restrictions were not warranted.

Berta argues remand is nonetheless required because the ALJ found her diplopia was a severe impairment at step two and, therefore, should have included limitations in the RFC relating to that condition or articulated his reasons for failing to do so. This argument is without merit. First, the ALJ did, in fact, include limitations specifically relating to Berta's diplopia in the RFC

by restricting her to jobs "not requiring more than occasional near and far acuity."  (Tr. 21.)
Second, the Court finds the RFC adequately addresses impairment in Berta's full range of vision
by limiting her to no commercial driving.  (*Id*.)

Finally, Berta maintains remand is required because the ALJ failed to properly evaluate
her subjective symptoms.  When a claimant alleges symptoms of disabling severity, an ALJ must
follow a two-step process for evaluating these symptoms.  *See e.g, Massey v. Comm'r of Soc. Sec*.,
2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an
underlying medically determinable physical or mental impairment that could reasonably be
expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and
persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms
limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[9] 2016
WL 1119029 (March 16, 2016).

If the claimant's allegations are not substantiated by the medical record, the ALJ must
make a credibility[10] determination of the individual's statements based on the entire case record.
Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See*

---

[9]     SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28,
        2016.  Thus, SSR 16-3 was in effect at the time of the February 22, 2017 hearing.

[10]    SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-
        3p directs the ALJ to consider a claimant's "statements about the intensity,
        persistence, and limiting effects of the symptoms," and "evaluate whether the
        statements are consistent with objective medical evidence and other evidence."
        SSR 16-3p, 2016 WL 1119029 at *6.  The Sixth Circuit has characterized SSR
        16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that
        subjective symptom evaluation is not an examination of an individual's
        character.'"  *Dooley v. Comm'r of Soc. Sec*., 656 Fed. App'x 113, 119 n.1 (6th Cir.
        2016).

*Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms"  SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  Beyond medical evidence, there are seven factors that the ALJ should consider.[11]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis.

---

[11]    The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

2005).

Here, substantial evidence supports the ALJ's evaluation of Berta's subjective symptoms. As the ALJ correctly noted (and has been addressed above), objective medical evidence from the relevant time period is not consistent with the severity of Berta's subjective complaints of disabling symptoms and limitations relating to her diplopia. (Tr. 22.) Physical examination findings consistently indicated normal visual acuity, and there is no evidence Berta reported or complained of double or blurred vision between November 2006 and December 2011. Tr. 575, 574, 558, 555, 552, 549, 545-546, 542-543, 539-540, 478, 535-537, 533.) Indeed, Berta expressly denied double vision, blurred vision, or visual dysfunction on several occasions during the relevant time period. (Tr. 539, 542, 478.) Additionally, the ALJ noted that, despite her visual limitations, Berta reported in both April 2009 and December 2010 that she continued to drive without difficulty. (Tr. 23-24.)

The ALJ also explained that "the claimant has described daily activities, which are not limited to the extent one would expect, given her complaints of disabling symptoms and limitations." (Tr. 25.) Specifically, the ALJ noted Berta was able to care for her personal needs as well as those of her young son on a daily basis, prepare meals, care for her pets, do household chores, shop, count change, handle a checkbook, watch television, bake sweets, go to church, and visit with family friends. (*Id*.) Berta has not argued these findings are inaccurate, and the Court's own review finds they are supported by substantial evidence. (Tr. 70-71, 326-329.)

While Berta urges the Court to find that the reasons given by the ALJ do not demonstrate a lack of credibility, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment

for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  The ALJ provided sufficiently specific reasons for his evaluation of Berta's subjective symptoms and supported those reasons with reference to specific evidence in the record.  Berta's argument to the contrary is without merit.

Accordingly, and for all the reasons set forth above, Berta's assignment of error is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


s/Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: January 29, 2019

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**